JUDGE SWEET

PATTERSON BELKNAP WEBB & TYLER LLP
Gloria C. Phares (gcphares@pbwt.com)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for Nelle Harper Lee*

United States District Court
Southern District of New York



**13 CIV 3000**

---

NELLE HARPER LEE

               Plaintiff,

   vs.

SAMUEL L. PINKUS; GERALD POSNER,
LEIGH ANN WINICK; VERITAS MEDIA, INC;
PHILOLOGUS PROCURATOR, INC.; NASSAU
MARKETING LLC; KEYSTONE LITERARY
LLC; and UNKNOWN ENTITIES Nos. 1-5,

               Defendants.

---

No. 12 Civ. _____

**COMPLAINT**

---

      Nelle Harper Lee ("Harper Lee"), by her attorneys Patterson Belknap Webb &

Tyler LLP, for her complaint against defendants Samuel L. Pinkus; Gerald Posner; Leigh

Ann Winick; Veritas Media, Inc.; Philologus Procurator, Inc.; Nassau Marketing LLC;

Keystone Literary LLC; and Unknown Entities Nos. 1-5, hereby alleges upon personal

knowledge as to herself and her own conduct and upon information and belief as to all

other matters.

## THE PARTIES

     1.    Harper Lee, the author of the renowned book, entitled *To Kill a*

*Mockingbird*, is domiciled in Monroeville, Alabama.

2.      Defendant Samuel L. Pinkus ("Pinkus"), a New York lawyer, whose registration is delinquent, resides at 111 Euclid Avenue, Hastings On Hudson, New York  10706;

3.      Gerald Posner is a registered New York lawyer with an office at 228 Park Avenue South, Suite 52176, New York, New York, and an investigative journalist, who maintains a residence at 1521 Alton Road, Suite 313, Miami Beach, Florida  33139.  He was the incorporator of Defendant Philologus Procurator, Inc. and has conducted PPI business with foreign literary agents.

4.      Defendant Leigh Ann Winick, Pinkus's wife, is an individual who resides at 111 Euclid Avenue, Hastings On Hudson, New York  10706; she is the President of Keystone Literary LLC.

5.      Defendant Veritas Media, Inc. ("VMI") was organized under the laws of the State of New York, on March 11, 2005, and its principal place of business is Pinkus's home address, 111 Euclid Avenue, Hastings On Hudson, New York  10706.

6.      Defendant Philologus Procurator, Inc. ("PPI") was organized under the laws of the State of Florida, on January 26, 2011, and its principal place of business is Pinkus's home address, 111 Euclid Avenue, Hastings On Hudson, New York  10706. Samuel L. Pinkus is its director and he is the current registered agent at 1521 Alton Road, Suite 313, Miami Beach, Florida  33139, where Posner maintains a residence.

7.      Defendant Nassau Marketing LLC ("Nassau Marketing") was organized in September 2007 under the laws of the State of New York, and has an address for

-2-

service of process at address at 911 Avenue U, Brooklyn, NY 11227, the same address used by Keystone.

8.        Defendant Keystone Literary LLC ("Keystone") was organized under the laws of the state of New York, on September 24, 2012, and it has an address for service of process at 911 Avenue U, Brooklyn, NY 11227, the same address used by Nassau Marketing LLC.  Defendant Leigh Ann Winick, Pinkus's wife, is its president.

9.        Unknown Entities Nos. 1-5 are unknown corporate entities, whether or not formally organized under the laws of any state, which Pinkus or Winick has used to conduct business relating to Harper Lee and *TKAM*, which may also include Sam Pinkus Enterprises.  On information and belief, none is a citizen of Alabama.

10.       The entities described in Paragraphs 5-9 are sometimes referred to as the "Pinkus Companies."

### JURISDICTION AND VENUE

11.       This Court has jurisdiction over the parties under 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

### NATURE OF THE CASE

12.       Harper Lee is the author of *To Kill a Mockingbird* ("TKAM"), one of the most read and influential American novels of the 20th Century.  Over the fifty-plus years since the publication of TKAM and the successful movie version starring Gregory Peck, Harper Lee has earned substantial royalties from her book.  Until 2006, there

could have been no question that Harper Lee held the valuable copyright to her novel and licensed new editions and translations of her novel around the world.

13.    For virtually all the time since the publication of her famous novel, Harper Lee was represented in her literary activities by Mackintosh & Otis ("M&O"), which sought to advance her interests as is appropriate for a literary agent. Unfortunately, when M&O's principal, Eugene Winick, became ill in 2002, his son-in-law, Defendant Pinkus, took the opportunity to divert several M&O clients to a new company that Pinkus controlled, Veritas Media, Inc. ("VMI"), and then engaged in a scheme to dupe Harper Lee, then 80 years old with declining hearing and eyesight, into assigning her valuable TKAM copyright to VMI for no consideration.

14.    Pinkus's motive for engaging in this conduct appears related to his efforts to avoid M&O's efforts to collect on a judgment that it had recovered against VMI in a New York arbitration over entitlement to commissions on the works and authors (including Harper Lee) that Pinkus had diverted from M&O during Eugene Winick's illness. (See Exh. A.) To avoid that judgment against VMI, Pinkus created several different companies to handle the receipt of royalties and commissions and directed the payment of royalties to a continually changing series of bank accounts. Pinkus also assigned Harper Lee's copyright, yet again, from VMI to another company that he controlled and signed foreign licenses on Harper Lee's behalf granting rights at times when Pinkus knew that he owned the copyright in TKAM and that Harper Lee could not validly transfer the licensed rights. Through all these years, Pinkus ignored his agent's duty of loyalty and diligence to Harper Lee, his principal, and neglected his

-4-

obligation to act at all times in her interest. That dereliction of duty included his failure
to exploit Harper Lee's copyright on her behalf, even when pressed by publishers and
potential licensees to do so.

15.     In this action, Harper Lee seeks to ensure her ownership in the *TKAM*
copyright, which should belong to her and no one else, and to hold Pinkus and his co-
defendants responsible for the harm that they have caused.

## GENERAL ALLEGATIONS

16.     *To Kill a Mockingbird* was first published in 1960 and two years later was
the subject of an equally renowned movie of the same name, based on TKAM, starring
Gregory Peck.

17.     Harper Lee, a resident of Monroeville, Alabama, is 87 years old. When the
conduct alleged in this complaint first began, she was 80. For over 15 years, she has
suffered from increasingly serious deafness and, for 6-7 years, macular degeneration,
which makes it difficult for her to read documents not printed in very large type. In
June 2007, she suffered a stroke, making it difficult for her to move around easily, but
not affecting her mental capabilities. Until late 2011, Harper Lee's lawyer was her older
sister, Alice Lee, now 101 years old. Alice Lee's deafness began about 20 years ago, and
she eventually became profoundly deaf; starting around 2006, she relied on lip-reading.

18.     Soon after the 1960 publication of *TKAM*, M&O and Winick became
Harper Lee's literary agent and handled her relations with both her domestic publisher
(originally Lippincott, now HarperCollins, Publishers, Inc. ("HarperCollins") and
foreign publishers all over the world.

19.     As Harper Lee's literary agent, M&O owed her a fiduciary duty of loyalty. During its decades of representation, M&O acted appropriately and in Harper Lee's interests, handling the kinds of activities that are the business of a literary agent. In the trade, M&O "worked the copyright" so as to enhance the principal's income from exploitation of rights under the copyright. Using its network of sub-agents around the world, M&O managed Harper Lee's relations with her publishers, arranged for licenses for publication of *TKAM* worldwide in translation; dealt with permissions for various kinds of licenses; collected royalties; reviewed royalty statements for accuracy; and distributed royalties to Harper Lee. As is customary for a literary agent, M&O conferred with Harper Lee and her lawyer (her sister, Alice Lee) about publishing opportunities before securing them on Harper Lee's behalf. Both Harper Lee and her sister trusted and relied on M&O, and worked amicably with the agency for over forty years, first with Eugene Winick, and then with his son-in-law, Pinkus (during the years when Pinkus was employed by M&O).

20.     The dispute between M&O and VMI was the subject of a mediation, a 2008 settlement agreement, effective January 13, 2006, and then an arbitration under the terms of that settlement agreement. The arbitration was finally decided in M&O's favor in June 2012. VMI was ordered to comply with the parties' settlement agreement, "on a going forward basis, to the extent [VMI] or Samuel Pinkus as its agent receives or has received any documents or commissions subject to the Agreement" (emphasis added). In the absence of evidence that VMI was undercapitalized or that Pinkus did not respect corporate formalities or did not otherwise abuse the privilege of doing business in a

-6-

corporate form, the arbitrator did not find liability against Pinkus personally. On

October 24, 2012, the New York Supreme Court confirmed the award of $779,780.34

plus interest (not all relating to *TKAM*).

### Pinkus misleads Harper Lee into assigning the *TKAM* copyright to VMI.

21.     In 2007, when Pinkus concedes that VMI was representing Harper Lee's

interests, Pinkus took the extraordinary step of arranging for Harper Lee to assign the

copyright in *TKAM* to VMI in a document dated May 5, 2007. The assignment ("2007

Purported Assignment"), drafted by Pinkus, transfers

> the entire interest in the copyright in the novel To Kill a Mockingbird
> including for example only any termination right in which I am, or in
> which I may become, vested pursuant to any contract, copyright law, or
> otherwise, also including the for explicitness any termination right or
> right to re-license the extant motion picture starring Gregory Peck, e.g.,
> based on the aforementioned novel in which I am or in which I may
> become vested. . . .

The assignment does not recite any consideration. The document was not notarized.

22.     Harper Lee has no recollection of having discussed an assignment of her

copyright with Pinkus or of having signed the 2007 Purported Assignment. Because it

was difficult to communicate with Harper Lee by telephone, Pinkus often visited her in

Alabama, especially when he had papers that needed to be signed. Since 2007, after

suffering a stroke, Harper Lee has lived in an assisted living facility, and Pinkus visited

her there, sometimes without prior announcement, until Harper Lee finally gave orders

that the management of the facility was not to permit his entrance.

**Having engineered the 2007 Purported Assignment of the *TKAM* copyright
to VMI, Pinkus diverts VMI's commissions to other companies he controls.**

23.    As the foreign licenses made by M&O expired, Pinkus made new licenses
with foreign publishers.  For example, although Pinkus testified during the M&O
arbitration hearing that VMI did not represent Harper Lee after January 1, 2009, Pinkus
signed a May 5, 2009 letter agreement between Harper Lee and William Heinemann
Ltd., the UK publisher, amending the original 1960 publishing agreement to add rights
that the UK publisher was permitted to exploit.  Pinkus signed on behalf of Harper Lee,
despite knowing that at that time Harper Lee did not own the copyright in *TKAM* and
could not, as a matter of law, convey the rights described in that addendum because the
*TKAM* copyright was at the time owned by VMI.

24.    The 2009 agreement with the UK publisher also directed the publisher to
pay "all monies due under the Agreement and this Addendum" to the UK subagent,
"acting on behalf of Nassau Marketing, LLC, 911 Avenue U, Brooklyn, NY  11227 who
is hereby authorized by [Harper Lee] to collect and receive such monies."  Finally, the
agreement provided that the UK subagent "on behalf of Nassau Marketing, LLC is
hereby empowered to negotiate as agent for [Harper Lee] in all matters arising out of
the Agreement and this Amendment thereto."  Harper Lee never authorized Nassau
Marketing to act on her behalf.

25.    Nassau Marketing's true role has come to light very recently.  On May 1,
2013 letter, a British lawyer for Prolologus Procurator, Inc., wrote to Harper Lee's UK
literary agent demanding the payment to Prolologus of commissions that the UK agent

is holding until this matter is resolved.  As the basis for his demand, he explained that "[VMI] irrevocably assigned its interest in commissions earned from [*TKAM*] to Nassau Marketing Inc. [sic]."  In other words, VMI, the owner of the *TKAM* copyright (VMI), assigned the right to receive royalties to Nassau Marketing, LLC, so that they would not be commissions received by VMI or its agent, Pinkus, subject to the arbitration agreement (*see* ¶ 20 above).  In this way, Pinkus prevented VMI from "receiving" commissions from Harper Lee's copyrights.

26.     Nassau Marketing, which was organized in September 2007, shortly after the 2007 Purported Assignment, has the same address for service of process as Keystone Literary, LLC, of which Pinkus's wife, defendant Leigh Ann Winick, is now President. The incorporation papers for both entities were also drafted by the same person.

27.     The foreign subagent who handles translations of *TKAM*, arranged for a worldwide, three-year license between Harper Lee ("c/o Veritas Media, 111 Euclid Avenue, Hastings on Hudson, New York, NY") and a Hungarian publisher, dated September 3, 2010, for an edition in Hungarian.  The subagent sent the contract to Pinkus/VMI.  Pinkus claimed that he signed it but that it was lost, and he said that he would re-send it.  Although the contract was sent to Pinkus several times, he never returned a signed copy.  Because Pinkus said he had signed and accepted the agreement, the publisher went ahead with publication, and commissions were paid to the subagent.

28.     The VMI/M&O arbitration occurred in May 2011 and February and March 2012.  (Exh. A, Final Award ("FA") 2)  Pinkus testified at the arbitration that VMI

represented Harper Lee from at least January 2006 until Harper Lee discharged VMI (and him) as of January 1, 2009. (FA 12). Pinkus did not notify HarperCollins that VMI was no longer agent of record after January 1, 2009. (FA 13)  VMI continued to communicate with HarperCollins, purporting to represent Harper Lee until at least November 2010.

29.    VMI has never observed corporate formalities. Since its incorporation on March 11, 2005, it has never filed the required biennial report. On information and belief, it has not maintained a board minute book, reflecting board actions.

30.    Pinkus also prepared "to whom it may concern" communications, which he caused Harper Lee to sign and which were sent to foreign subagents, (a) instructing them that VMI represented her and they should send all information relating to her work to Pinkus at VMI (October 10, 2008); and (b) stating that they should not provide information about her or her book, especially financial information, to anyone, including M&O, without her permission (August 8, 2010). Drafted to come from Harper Lee, these directions were not intended to protect Harper Lee's interests. They were intended to advance Pinkus's and the other defendants' interest in hiding information from M&O or having to pay any commissions to it.

31.    Harper Lee became increasingly dissatisfied about her relations with VMI and Pinkus. In addition to the friction caused by his dispute with M&O, Pinkus, for example, paid royalties without providing royalty statements to support the payments. And nothing has changed with his succeeding companies. During 2011 and 2012, PPI (and more recently, Keystone, *see* below) did not provide royalty statements. Instead it

-10-

sent a "remittance advice" a one-page document that stated only the gross received by PPI (or Keystone), the name of the remitting entity, the commission to the foreign agent (in some cases), and the commission deducted by PPI (or Keystone), resulting in the net paid to Harper Lee. Sometimes, the advice included the amount of expenses.

32.     Pinkus testified during the arbitration that all of VMI's assets were sold in or about 2008 or 2009, and that VMI had no assets. In addition to the directions to the UK agent to send royalties and commissions to Nassau Marketing (*see* ¶ 25), another reason that VMI had no cash "assets" was that on July 26, 2010, Pinkus wrote to HarperCollins on VMI letterhead, directing it to send payments to a bank account that Pinkus had established in Harper Lee's name at Citibank in Hastings On Hudson, New York, the same town in which he lives. Pinkus also did not reveal during the arbitration that he had arranged by contract with foreign authors and foreign subagents for royalties and commissions to be sent to other Pinkus Companies. Pinkus also failed to testify at the arbitration that one "asset" that VMI then retained was the copyright in *TKAM.*

33.     During the arbitration, Pinkus also testified that all U.S. royalties VMI received in 2009 and 2010, relating to Harper Lee were sent to her without the deduction of commission (FA 12), even though the remittance advices for those periods reflect the deduction of VMI's 10% commission.

34.     Pinkus testified during the arbitration that he had discarded and therefore could not produce any documentation relating to VMI's receipt of commissions or compliance with the settlement agreement with M&O. From that, the arbitrator drew a

negative, adverse inference from VMI's failure to present evidence to support Pinkus's testimony, especially in the face of contrary evidence presented by M&O, VMI's failure to notify HarperCollins of its discharge, and Pinkus's "cavalier attitude" toward VMI's obligations under the settlement agreement with M&O, and especially for failing to offer a credible explanation for "throwing out" all records relating to VMI's receipt and disposition of royalty payments. (FA 13).

**Pinkus creates a new corporate entity, Prolologus Procurator, Inc.
and causes VMI to assign the *TKAM* copyright to it.**

35.     The Final Award is dated June 8, 2012. (FA 19) By then, however, Pinkus had taken other steps to secure his own interests at the expense of Harper Lee's interests. First, he arranged for the formation of a new corporation, Philologus Procurator, Inc. ("PPI"). On January 26, 2011, PPI was incorporated in Florida, by Gerald Posner, residing at 1521 Alton Road, Suite 313, Miami Beach, FL ("Miami Beach Address").

36.     Days later, in a document dated February 7, 2011, Pinkus, acting as President of VMI, assigned the copyright in *TKAM* from VMI to PPI ("2011 Purported Assignment"), whose address is identified as located at Posner's Miami Beach Address. The assignment was in the exact language of the 2007 Purported Assignment that Pinkus had drafted from Harper Lee to VMI, including the first-person personal pronoun "I" that was grammatically inappropriate as a reference to VMI.

37.     On April 11, 2011, Harper Lee met in a meeting room in an Atmore, Alabama hotel with Pinkus, Harper Lee's estate lawyer, Tonja Carter (one of Alice Lee's

law partners), and others to sign a series of documents related to a trust that Harper Lee

was establishing. At the end of the meeting, after all the papers were signed, Pinkus

took out another document and asked Harper Lee whether she remembered signing her

copyright in *TKAM* to him and then told her that this document was just intended to

confirm that assignment. Although not assenting to Pinkus's inquiry, Harper Lee

signed the document ("2011 Purported Reconfirmation"). Ms. Carter notarized her

signature, correcting (in hand) the spelling of Escambia County but leaving blank the

date in the notary statement. Until that moment, neither Harper Lee or Harper Lee's

estate lawyer or Ms. Carter was aware of the 2007 Purported Assignment. Harper Lee

had never heard of PPI.

38.     The document that Pinkus produced on April 11, 2011 ("2011 Purported

Confirmation"), was drafted with Harper Lee's name and address at the top, followed

by the date February 9, 2011, two days after the 2011 Purported Assignment, signed by

Pinkus. After the words "To whom it may concern," It stated completely as follows:

> I hereby reconfirm the Assignment of Copyright dated May 5, 2007, that I
> executed in favor of Veritas Media, Inc. regarding the copyright in and to
> my novel To Kill a Mockingbird" (copy attached as Exhibit "A") and ratify
> the Assignment of Copyright dated February 7, 2011, of that copyright by
> Veritas Media, Inc. to Philologus Procurator, Inc. (copy attached as Exhibit
> "B").

Harper Lee's signature was "witnessed" by Harper Lee's estate lawyer and a friend of

Harper Lee.

39.     Ms. Carter asked for a copy of the 2011 Purported Confirmation with the

attached 2007 Purported Assignment and the 2011 Purported Assignment, and Pinkus

-13-

said he would send one. Although Ms. Carter repeatedly requested a copy of the 2011

Purported Confirmation, it took over almost 10 months of persistence, until February 2,

2012, before Pinkus finally provided her a copy. At the same time, Ms. Carter also

pressed Pinkus to reassign the *TKAM* copyright to Harper Lee.

**Pinkus's attempts to dissociate himself from PPI are unsuccessful.**

40.     In September 2011, Pinkus, emailing from "slplaw@mac.com, directed a

licensing inquiry to Posner at "philologusprocurator@gmail.com," asking him to follow

up on a matter with the UK agent. During September and October, Posner explained to

the UK agent why it was unwilling to go forward with e-book licensing at that time.

Posner was the principal person that the foreign agents worked with at the

philologusprocurator@gmail.com email address.

41.     In November 2011, an unsigned email from "Philologus Procurator"

<philogousprocurator@gmail.com> to the UK agent announced that Harper Lee's

checking account to which the UK agents had been wiring payments had been closed

and directed it "to make all royalty payments due her via check made payable to

Philologus Procurator, Inc. and, in the meantime, send to Sam Pinkus at 111 Euclid

Avenue, Hastings on Hudson. He will forward the checks to [PPI] for deposit." Pinkus

notified HarperCollins that it should send royalties to PPI.

42.     Throughout 2012, Pinkus attempted to conceal from HarperCollins his

connection with PPI. On January 6, 2012, using the email address, slplaw@mac.com, he

wrote to HarperCollins, saying that he had received the "attached document from

philologus procurator, inc." The attached document was the 2011 Purported

-14-

Confirmation with the attached 2007 Purported Assignment and the 2011 Purported Assignment. Pinkus noted that "[Harper Lee's] current address has been redacted but the balance is as in the original." This was not accurate. The space for the date, which Ms. Carter had left blank, now contained a date written in handwriting that differed from Ms. Carter's distinctive handwriting. The date did not match the date, April 11, 2011, on which the document was actually signed; instead someone had written "February 9" to be consistent with the date typed on the document when it was originally prepared. Redacting Harper Lee's address also concealed another inaccuracy in the document: it was not signed at Harper Lee's residence in Monroe County, but at the Atmore hotel in Escambia County.

43. Then, referring to PPI in the third person, Pinkus's January 6, 2012 email continued, "philologus has asked whether you are able to send royalty statements via email yet. if so, I include below the company's email address. [F]inally, whenever a wire is sent would you please send, contemporaneously, confirmation of the wire to philologus at the below email address." That email address was philologusprocurator@gmail.com. Pinkus also enclosed the wiring instructions for PPI's Citibank account in Miami Beach, Florida, the company's tax I.D. number, and its address, Posner's Miami Beach Address. In all Pinkus's conversations with HarperCollins, he insisted, despite his contrary conduct, that PPI had nothing to do with VMI or Pinkus himself.

44. Relying on the 2007 Purported Assignment and the 2011 Purported Assignment that Pinkus offered to justify payment to PPI, HarperCollins paid the April

-15-

2, 2012 royalties to PPI, and after taking a 10% commission ($55,444), PPI paid the royalties to Harper Lee. The UK agent also sent its April 2012 payment to PPI, which took its $17,226 commission before paying Harper Lee. According to the May 1, 2013 letter of PPI's UK lawyer (*see* ¶ 15 above), the UK agent paid PPI because Nassau Marketing had "directed that ... commissions and royalties be paid to Philologus on behalf of Nassau Marketing and Harper Lee."

**Pinkus, signing as PPI's president, assigns the *TKAM* copyright to Harper Lee.**

45.    In January 2012, Harper Lee's estate lawyer and a Pinkus acquaintance, had joined Ms. Carter's continuing effort to force Pinkus to reassign the *TKAM* copyright to Harper Lee. A Birmingham law firm drafted the copyright assignment, and after receipt of HarperCollins's April 2012 royalties, Pinkus, acting as President of PPI, assigned the copyright to Harper Lee, dated April 13, 2012, from PPI, described as located at Posner's Miami Beach Address.

46.    The re-assignment transferred all the right, title and interest in the *TKAM* copyright that had been assigned by the 2007 Purported Assignment and the 2011 Purported Assignment. It included the same basic assignment language included in the 2007 Purported Assignment and the 2011 Purported Assignment, but this document also included paragraphs added by Pinkus intended to benefit VMI and PPI. Specifically, PPI "acknowledges" that neither it nor VMI ever acquired any rights to any revenues, financial benefits, royalties, or any benefit whatsoever derived from the exploitation of [TKAM]." Because both VMI and PPI obtained commissions derived from exploiting the rights in *TKAM*, that "acknowledgement" was false.

47.     The April 13, 2012 copyright re-assignment also declares that

"[n]otwithstanding anything herein to the contrary, nothing herein shall deminish [sic],

restrict, or otherwise effect [sic] [VMI's] or [PPI's] agency relationship with Harper Lee,

or To Kill a Mockingbird nor [VMI's] or [PPI's] right to receive its commissions as agent

of record for Harper Lee and To Kill a Mockingbird, all of which is hereby

acknowledged."  Harper Lee is not a signatory to the assignment.  She could not have

and has never acknowledged any of these self-serving statements by PPI and Pinkus, its

President.

48.     In summer 2012, HarperCollins asked to whom it should pay the royalties

that would be due in October 2012.  Instructed that it should pay them to Ms. Carter,

HarperCollins notified PPI of its intent to do so.  On October 4, 2012, HarperCollins

received an email (from the email address "Philologus Procurator

<philologusprocurator@gmail.com>"), which stated in full:

> Dear Ms. Silfin:
>
> Philologus Procurator, Inc. (PPI) agrees to indemnify HarperCollins, its
> officers, directors, employees and related entities from and against any
> and all claims, actions, suits, proceedings, and the like arising as a result
> of the payment of commissions generated by sales of To Kill a
> Mockingbird.
>
> For your edification, PPI is neither a successor-in-interest to Veritas
> Media, Inc., nor is it owned or controlled by Samuel L. Pinkus.

The message was not signed by an identified sender.

49.     In conversations with HarperCollins throughout 2011 and 2012, Pinkus

repeatedly denied that PPI was a successor of VMI.  In October 2012, when

HarperCollins hesitated to pay royalties or commissions to PPI, Pinkus told an in-house

-17-

HarperCollins lawyer that he was no longer the president or otherwise involved with PPI.

50.     In July 2012, Pinkus, writing from the email address, sampinkus@mac.com, informed Ms. Carter that "the new corporate name for the agency will be Keystone Literary Agency. It is being filed today." In fact, Keystone was not organized until September 2012 (as Keystone Literacy LLC); its name was changed in December 2012. Pinkus's wife, defendant Leigh Ann Winick, is Keystone's president.

51.     Keystone was organized by the same person who organized Nassau Marketing LLC; both have the same Avenue U address for service of process, and it appears that Keystone has succeeded Nassau Marketing for the receipt of payments of royalties and commissions paid to PPI from the sales of *TKAM*. In October 2012, the UK subagent paid $106,279 in royalties to PPI relating to *TKAM*. That payment, less a $11,715 commission to PPI deducted, was mailed to Harper Lee not by PPI but by Keystone with a Keystone check drawn on a Chase bank and signed by defendant Winick. Harper Lee has not authorized Keystone to act as her agent or to handle royalties due to her.

**Pinkus and the Pinkus Companies are discharged as Harper Lee's agent, and Pinkus misrepresents PPI's entitlement to royalties.**

52.     In April 2012, Ms. Carter, who obtained a durable power of attorney for Harper Lee at the end of January 2012, orally discharged Pinkus as agent for Harper Lee and rescinded all powers of attorney. In letters dated December 3, 2012, and January

23, 2013 letter, Ms. Carter discharged Pinkus and all of the Pinkus Companies of which she was then aware.

53.     In email exchanges with Ms. Carter, Pinkus, now writing from the email of Keystone, claimed that he had an agreement with Harper Lee that assured his role as agent. When a lawyer for Harper Lee contacted Pinkus in December 2012 for a copy of the agreement, he refused to provide it unless Harper Lee, his purported principal, signed a confidentiality agreement. The proffered confidentiality agreement was set out as a letter agreement between Harper Lee and Keystone Literary LLC, to be signed by defendant Winick as President of Keystone. The terms of the letter agreement referred to an April 26, 2006 agency agreement on which Pinkus was relying as the "Property." Before obtaining the Property, Harper Lee was obliged to agree that the "Property" and the information in it "are exclusively the property of Samuel L. Pinkus and Keystone Literary, LLC." Harper Lee was also required to "agree not to take notes of or in any way record any information or material in the Property . . . " and agree that she could use the information in the Property "only for the limited purpose of allowing you to review the Property in connection with a settlement of any claim arising out of the terms of the Property." Harper Lee did not sign the proposed confidentiality agreement.

54.     In March 2013, anticipating the April 1 distributions of royalties for the six-month period ending December 31, 2012, PPI sent new wire instructions to HarperCollins and the foreign subagents, directing payments to the account name,

Philologus Procurator Inc. at the M&T Bank, 218 Saw Mill River Road, Elmsford, NY, not far from Pinkus's home.

55.     On January 17, 2013, Pinkus filed a 2013 annual report for PPI, which listed Pinkus as the director; provided Pinkus's home address as PPI's current principal place of business; and listed Pinkus as the registered agent, with the same Miami Beach Address (including apartment number), that the original incorporator, Posner, had provided. The annual report does not list any officers as is required.

56.     On April 8, 2013, without disclosing the April 13, 2012 re-assignment of the *TKAM* copyright to Harper Lee, Pinkus used the 2007 Purported Assignment and the 2011 Purported Assignment as the basis for pressuring the UK subagent that PPI was entitled to be paid royalties. Pinkus sent an email from the email address, sampinkus@mac.com, to the UK agent. He attached the two documents, describing them as "a grant from miss lee to veritas and the second is an acknowledgement signed by miss lee (and notarized by her attorney) reconfirming the original grant and ratifying the assignment from veritas to philologus." Then, without revealing the April, 13, 2013 copyright re-assignment, signed a year earlier, Pinkus stated "I do believe this establishes philologus's entitlement to its commission. *** I trust this resolves the issue and that you will now forward payment to philologus as previously directed." The UK agent relied on that representation and was on the brink of wiring the royalties and commission when it was provided with a copy of that 2013 copyright re-assignment. As a consequence, the April 2013 commission for the six-month period ending December 31, 2012, was not sent to PPI.

**Pinkus breached his duty to "work the copyright" for Harper Lee's benefit.**

57.     In the years since Pinkus left M&O, he has acted on Harper Lee's behalf primarily to the extent of trying to secure irrevocably his right to commissions from *TKAM* until the end of copyright. He has not responded to offers by HarperCollins to discuss the licensing of e-book rights; he failed to respond to requests for permissions from other publishers, which sometimes went without responses for years; he failed to respond to HarperCollins's requests for assistance related to the 50th anniversary of *TKAM*'s publication. Pinkus ensured that a termination notice was given to HarperCollins and other licensees, entitling Harper Lee to negotiate a new U.S. agreement beginning in 2016. If Pinkus negotiated those agreements, he stood to benefit from what presumably would be higher royalties. The Copyright Act permits the current licensee to negotiate before the designated 2016 termination date, and HarperCollins has offered terms. Not until 2012 did Pinkus even respond to that offer and then made no further efforts to negotiate.

58.     Potential licensees for rights not controlled by HarperCollins, unable to obtain responses from Pinkus about licensing, have sought HarperCollins's assistance in reaching him or getting him to return their communications. When HarperCollins, which does not control electronic rights to *TKAM*, alerted Pinkus in 2010 of infringing e-copies of the title on the web and suggested a way of preempting that market, Pinkus took no actions to deter infringing copies (or to discuss HarperCollins's proffered business proposal).

59.     Pinkus's lack of attention to the exploitation of rights was not confined to domestic rights.  In April 2013, a Spanish agent, who handles licenses in South America, sent an urgent email to PPI, copying Pinkus at the email address, slplaw@mac.com, and forwarding a March 26, 2013 email.  That email stated that on December 4, 2012, the Spanish agent had sent a renewal contract for *TKAM* in Brazil and that reminders had been sent on January 15, 2013 and February 4, 2013 with no reply.  The Spanish agent reported that the Brazilian publisher needed to reprint and was very upset about not having received a signed contract from Pinkus.  She also asked several questions about the status of the contract and pleaded for a response.  Pinkus's response, which came from the pholologusprocurator@gmail.com address, was that this and all prior communications had gone into "our" junk mail.  Only then did he report that "Although Philologus was the agent of record when this negotiation began, we have been instructed to refer all matters to Miss Lee's attorney.  Nevertheless we reserve Philologus's right to receive its commission from this negotiation."

60.     Based on the royalties and commissions that VMI received from HarperCollins alone, during 2008 and 2009 only, VMI received $180,000 in commissions.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty and Self-Dealing Against All Defendants)

61.     Harper Lee realleges her paragraphs 1 through 60 of this Complaint.

62.     An agent is a fiduciary, which requires conduct that advances the interests of the agent's principal only; it does not include self-dealing with the principal's property. It does not include assigning a principal's copyright to her agent.

63.     The transfer of ownership of an author's copyright to her agent is incompatible with her agent's duty of loyalty; it is a gross example of self-dealing. Pinkus engineered such a transfer as part of a scheme to secure to himself an irrevocable interest in the income stream from Harper Lee's copyright and to avoid his legal obligations to M&O under the arbitration decision. By creating companies, such as VMI and PPI, and conniving to transfer Harper Lee's copyright to them, and then assigning the right to receive income to other corporate entities, Pinkus intended (a) to avoid any legal conclusion that these companies were successors of the VMI agency VMI; (b) to ensure that VMI would not "receive commissions" that might be subject to the settlement agreement with M&O; and (c) to create a legal basis for claiming that he owned an agency coupled with an interest and therefore could not be discharged.

64.     Harper Lee has no knowledge of the extent the copyright was encumbered during the five years it was assigned. Nor, given Pinkus's repeated denials of his association with PPI, does Harper Lee have any assurance that the PPI board authorized the reassignment or that Pinkus's signature, acting as President, was effective to transfer the copyright on PPI's behalf.

65.     Pinkus also created multiple, ever-changing bank accounts and companies that further concealed VMI's and PPI's receipt of royalty income subject to the

-23-

arbitration award. Harper Lee never authorized these Pinkus Companies to represent her interests.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty of Loyalty Against All Defendants)

66.    Harper Lee realleges here paragraphs 1 through 65 of this Complaint.

67.    An agent is a fiduciary and has a duty of loyalty to his principal, which requires absolute candor and truthfulness.

68.    Pinkus knew that Harper Lee was an elderly woman with physical infirmities that made it difficult for her to read and see. He also knew that Harper Lee and her sister (and lawyer) relied on and trusted him. Pinkus abused that trust and took advantage of Harper Lee's physical condition and years of trust built at M&O to engineer the assignment of her copyright in a document that did not even ensure her a contractual right to income. Harper Lee had no idea she had assigned her copyright to VMI. She had no way of knowing that VMI had assigned the copyright to PPI, an entity she had never heard of. Pinkus then obtained her alleged "reconfirmation" of those events without ever discussing the consequences of those assignments with her. Pinkus maneuvered these changes to advance his own interests and to ensure payment to the various Pinkus Companies. None of this conduct was taken to advance Harper Lee's interests.

69.    Even when Pinkus finally assigned the copyright from PPI to Harper Lee, he included in the document certain "acknowledgements" intended to ensure that VMI and PPI would be entitled to receive commissions from the exploitation of *TKAM* until

-24-

the end of copyright  These are not commitments that Harper Lee ever agreed to or "acknowledged" and they should not be honored.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty of Diligence Against All Defendants)

70.     Harper Lee realleges here paragraphs 1 through 69 of this Complaint.

71.     A principal obligation of a literary agent is to "work the copyright" in the interest of his principal.  That requires the agent to develop licensing opportunities and to exploit acceptable offers that are made to the agent.  Pinkus has not been diligent in his duty to work the copyright in *TKAM*.  Other than to ensure that the copyright would be owned by him, he has not been diligent in pursuing significant licensing offers, and has not responded diligently to contract terms that have been offered to him.  Moreover, by employing a scheme to assign the copyright in *TKAM* to VMI and PPI, Pinkus made it impossible to enter into valid contracts on Harper Lee's behalf.  He could not have negotiated licenses for exploitation of rights in the *TKAM* copyright on Harper Lee's behalf during the five years when VMI and PPI owned the copyright.

## FOURTH CAUSE OF ACTION

### (Against Defendants Pinkus, Veritas Media, Inc., and Philologus Procurator, Inc. for Fraudulent Inducement)

72.     Harper Lee realleges her paragraphs 1 through 71 of this Complaint.

73.     Defendant Pinkus represented to the UK subagent in April 2013 that the copyright in *TKAM* had been assigned first to VMI and then to PPI as grounds for his

entitlement to be paid royalties.  In doing so, he did not disclose the April 13, 2012 re-assignment of the *TKAM* copyright to Harper Lee.

74.   The UK subagent relied upon Pinkus's representations and was convinced that it must pay the royalties and commissions to PPI.  As a result, the agency's bookkeeper was instructed to make the wire transfer.  The wire was not sent only because of the intervention of a weekend and because Ms. Carter learned of Pinkus's representations and provided a copy of the assignment from PPI to Harper Lee.

75.   Pinkus re-assigned the *TKAM* copyright to Harper Lee on April 13, 2012, but he delayed doing so until a few days after he had shown HarperCollins the 2007 Purported Assignment and the 2011 Purported Assignment.  Harper Collins relied upon those fraudulent transfers of right to convey royalties and commissions to PPI.

## PRAYER FOR RELIEF

**WHEREFORE**, Harper Lee prays for the following relief:

A.   For an order that Pinkus, Posner, Winick, VMI, PPI, Nassau Marketing, Keystone, and all entities controlled by Pinkus, his wife, or Posner assign whatever rights they own in the *TKAM* copyright to Harper Lee and provide warranties that the copyright has not been encumbered in any way at any time;

B.   For forfeiture of all commissions received by VMI, PPI, Nassau Marketing, Keystone, or any other Pinkus Company since the 2007 Purported Assignment;

C.   For compensatory, consequential, and equitable damages to be proven at trial against Defendants;

D.   For an Order of prejudgment interest; and

E.     For an Order awarding Harper Lee such other and further relief as the Court deems just and proper.

New York, N.Y
May 3, 2013

Respectfully submitted,

Gloria C. Phares
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
*Attorneys for Nelle Harper Lee*



**FSC**
www.fsc.org

**MIX**

Paper from
responsible sources

**FSC® C014618**

FILED: NEW YORK COUNTY CLERK 12/07/2012

NYSCEF DOC. NO. 16

INDEX NO. 653312/2012

RECEIVED NYSCEF: 12/10/2012

8C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

MCINTOSH & OTIS, INC.,                                :        Index No. 653312/12

            Petitioner,                          :        ~~[stricken text]~~

   -- against --                                    :        **JUDGMENT
                                     CONFIRMING**
VERITAS MEDIA, INC.,                             :        **ARBITRATION AWARD**

            Respondent.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

      WHEREAS, Petitioner McIntosh & Otis, Inc., by its attorneys Frankfurt Kurnit Klein &

Selz, P.C., has filed its petition returnable October 23, 2012, for an order confirming a final

arbitration award, dated June 8, 2012, of the Judicial Arbitration and Mediation Services, Inc.

(the "Award"); and

      WHEREAS, the Award (at pages 16 and 19) ordered Veritas Media, Inc. to comply with

all terms of a certain Release and Settlement Agreement dated December 2008 and effective as

of January 13, 2006 (the "Agreement") on a going forward basis, to the extent Veritas Media

Inc., or Samuel Pinkus as its agent, receives or has received any documentation or commissions

subject to the Agreement;

      NOW, on application of Frankfurt Kurnit Klein & Selz, P.C., attorneys for petitioner

McIntosh & Otis, Inc., it is *& after consideration of π's proposed judgment*

      ADJUDGED that the Award is hereby confirmed; and it is further

**JEFFREY K. OING**
**J.S.C.**
      ADJUDGED that petitioner McIntosh & Otis, Inc., having an office located at 353

Lexington Avenue, New York, NY 10016, recover from respondent Veritas Media, Inc., having

an office located at 111 Euclid Avenue, Hastings-On-Hudson, NY 10706, the amount of

$779,780.34 with post-judgment interest (at the statutory rate of 9%) calculated at a per diem



rate of $192.27 from June 8, 2012 until paid, and that petitioner McIntosh & Otis, Inc. have

execution therefor; and it is further

  ADJUDGED that Veritas Media Inc. is further directed to comply with all terms of the

Agreement on a going forward basis, to the extent Veritas Media, Inc., or Samuel Pinkus as its

agent, receives or has received any documentation or commissions subject to the Agreement.

  JUDGMENT entered this ___ day of October, 2012.

                              _____, J.S.C.
                              **JEFFREY K. OING**
                              **J.S.C.**

                              _____
                                     CLERK

# FILED

DEC – 7 2012

NEW YORK
COUNTY CLERK'S OFFICE

2

653312/12

FRANKFURT KURNIT KLEIN & SELZ,
P.C.

By: _____
Toby Butterfield
Wendy Stryker

488 Madison Avenue, 10th Floor
New York, New York 10022
Tel.: (212) 980-0120
tbutterfield@fkks.com
wstryker@fkks.com

*Attorneys for Petitioner McIntosh & Otis,
Inc.*

Judgment

FILED

DEC - 7 2012

11:56 A M

AT
N.Y., CO. CLK'S OFFICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
                                                  :

MCINTOSH & OTIS, INC.,                  :   Index No.

           Petitioner,           :

    -against-                 :   **VERIFIED PETITION**
                                     :   **TO CONFIRM THE**
VERITAS MEDIA, INC.,             :   **ARBITRATION AWARD**

          Respondent.        :

-------------------------------------------------------------------X

      McIntosh & Otis, Inc. ("Petitioner" or "M&O"), by its attorneys Frankfurt Kurnit Klein & Selz, P.C., states as follows:

      1.     This is a Petition pursuant to CPLR § 7510 to confirm the arbitration award dated June 8, 2012 (the "Award," attached as Exhibit A hereto) that was issued by the Judicial Arbitration and Mediation Services, Inc. ("JAMS") arbitrator in the proceeding, *McIntosh And Otis, Inc. v. Veritas Media, Inc.*, Reference no. 1425006359 (the "Arbitration"), against the Respondent, Veritas Media, Inc. ("VMI"), and for entry of Judgment on the Award pursuant to CPLR § 7514.

**Parties, Jurisdiction and Venue**

      2.     Petitioner, M&O, is a New York corporation with its primary place of business located at 353 Lexington Avenue, New York, NY 10016.

      3.     Upon information and belief, VMI is a New York corporation with a principal place of business located at 111 Euclid Avenue, Hastings-On-Hudson, NY 10706.

      4.     This Court has subject matter jurisdiction over this controversy.

      5.     This Court has personal jurisdiction over Respondent pursuant to CPLR § 301.

      6.     Venue in this Court is proper pursuant to CPLR § 7502(a).

**Procedural History**

7.      M&O and VMI are competing literary agencies. M&O is an internationally acclaimed literary agency founded in 1928. VMI is a one-man operation run by Samuel Pinkus, the son-in-law of M&O President Eugene Winick. Although Pinkus had no experience with book publishing, Winick employed him at M&O and provided him with training and access to many of M&O's most important clients. In 2001, Pinkus was named President of M&O. In 2002 Winick became unable to work due to illness. After Winick returned, there were some difficulties with Pinkus. During negotiations as to Pinkus' role at M&O, it was discovered that Pinkus had secretly created his own agency, VMI, and was diverting clients away from M&O to VMI. This led to a mediation session before Peter Woodin, Esq. regarding M&O's right to continue receiving commissions on royalties and advances received by certain authors under agreements that M&O had negotiated, among other claims.

8.      In December 2008, the two agencies entered into a Release and Settlement Agreement (the "Agreement"), effective as of January 13, 2006, addressing M&O's entitlements to commissions for works of M&O clients that had been diverted to VMI by Pinkus, including mystery writer Mary Higgins Clark, Nelle Harper Lee, author of *To Kill a Mockingbird*, and the Joy of Cooking Trusts, the owner of *The Joy of Cooking*. The Agreement is between M&O and VMI, "and any successors in interest or successor entity incorporated, owned or controlled by Samuel Pinkus." The Agreement is attached as Exhibit B.

9.      Paragraph 20 of the Agreement contains an arbitration clause stating that "[a]ny disputes between or among M&O, VMI and Mr. Pinkus arising out of or relating to this Settlement Agreement in any manner . . . will be submitted first to mediator [Peter] Woodin or a mutually agreed upon third party for resolution, and if mediation is unsuccessful, then to binding arbitration in New York City by a JAMS/Endispute neutral . . . The decision of the arbitrator

shall be final, and judgment upon the award rendered may be entered in any State or Federal Court having jurisdiction over such decision."

10.     Paragraph 2(B) of the Agreement required the parties to resolve an outstanding dispute regarding $84,000 that VMI promised to hold in escrow and to pay to M&O in connection with *The Joy of Cooking*, and a dispute concerning whether the children's book *Ghost Ship* counted towards M&O's entitlement to share in commissions received by VMI generated by books by Mary Higgins Clark. Failing resolution, the parties were to submit these two disputes to Mr. Woodin for binding resolution no later than April 30, 2009. On March 5, 2009, M&O submitted these issues to Mr. Woodin by letter, but Mr. Pinkus, acting on behalf of VMI, failed to authorize Mr. Woodin to act as an arbitrator for this dispute, and so no resolution was reached by the deadline of April 30, 2009.

11.     On or about April 1, 2010, M&O filed a Statement of Claim against VMI alleging the VMI failed to comply with certain terms of the Agreement and seeking various remedies. Among other claims, M&O argued that, as a result of VMI's failure to authorize Mr. Woodin to resolve the dispute over *Joy of Cooking* and *Ghost Ship* commissions by the date stipulated in the Agreement, VMI owed M&O both the $84,000 held in escrow and M&O's portion of commissions concerning one of Mary Higgins Clark's bestselling mystery novels. M&O also alleged that Mr. Pinkus's actions on behalf of VMI materially breached the Agreement by failing to maintain and provide certain records and accountings, and failing to pay commissions and other payments that were due to M&O under the Agreement. Additionally, VMI failed to pay VMI's share of arbitration fees and M&O thus sought to recover VMI's share of fees that M&O paid to allow the arbitration to proceed. M&O also sought pre-judgment interest on amounts found to be owing to M&O. The Statement of Claim (which also attached the Agreement) is attached as Exhibit C.

12.     On May 4, 2011, a hearing took place between M&O and VMI before a single

JAMS arbitrator, Kathleen A. Roberts (the "Arbitrator"). At the hearing, VMI's President,

Samuel Pinkus, testified that he had sold all of VMI's assets, leaving the company without any

assets whatsoever. M&O then requested an award against Mr. Pinkus individually. The hearing

was re-opened on February 8, 2012 to address whether the panel could address M&O's request

to hold Mr. Pinkus individually liable, and supplemental evidence and argument from the parties

were received on February 23 and 29, and March 1, 2012.

13.     On March 21, 2012, the Arbitrator issued an Interim Award against VMI,

following which supplemental submissions were submitted by both parties on April 2 and 9, and

May 4, and 10, 2012. The Interim Award is attached as Exhibit D.

**The Award**

14.     The parties jointly requested that the Arbitrator provide a reasoned award.

15.     On or about June 8, 2012, the Arbitrator issued a Final Award against VMI and

any successors in interest or successor entity incorporated, owned or controlled by Samuel

Pinkus in which she concluded that VMI breached the Agreement and was liable to M&O in the

amount of $779,780.34 (the "Award") for royalties, health insurance costs, arbitration fees and

expenses, and prejudgment interest. *See* Ex. A. Among other things, the Final Award castigated

VMI and its principal Pinkus for failing to comply with its contractual obligations to maintain

and produce documentation regarding commissions received that were the subject of the

Agreement, and for asserting at the Arbitration that all records pertaining to VMI's compliance

with the Agreement had been discarded. *See* Ex. A at 11, 13, 16.

16.     Specifically, the Arbitrator found that:

(a)     VMI failed to pay M&O $197,500 for commissions due with respect to

Mary Higgins Clark;

(b)     VMI failed to pay M&O $84,375 in connection with the 75th anniversary edition of *The Joy of Cooking*, and that VMI's removal and use of these previously escrowed funds was "a blatant breach of the Agreement." Ex. A at 10.

(c)     VMI failed to pay M&O $36,473.71 for additional commissions received by VMI on royalties earned on *The Joy of Cooking*;

(d)     VMI failed to pay M&O $212,161.87 in connection with commissions received by VMI on royalties earned on Nelle Harper Lee's *To Kill A Mockingbird*;

(e)     VMI failed to pay M&O $19,899.24 for health insurance provided by M&O pursuant to the terms of the Agreement through 2011;

(f)     M&O is entitled to recover arbitration fees and expenses totaling $16,218.27 from VMI;

(g)     M&O is entitled to payment by VMI of prejudgment interest in the amount of $213,132.25;

(h)     VMI is directed to comply with the terms of the Agreement going forward, to pay to M&O commissions which VMI or Mr. Pinkus as its agent receives, to provide to M&O any documentation that VMI or Mr. Pinkus as its agent receives. Ex. A at 16, 19.

(i)     The Award was delivered to Petitioner and to Respondent on or about June 8, 2012.

**The Final Award Should Be Confirmed**

17.     M&O seeks to confirm the Award under § 7510 and enter Judgment against Respondent (defined in the Agreement as VMI or any successors in interest or successor entity incorporated, owned or controlled by Samuel Pinkus) in the amount of $779,780.34 with post-judgment interest (at the statutory rate of 9%) calculated at a per diem rate of $192.27 until paid.

18.     This application to confirm is timely, as it is made within one year after delivery of the Award to the parties.

19.     Respondent cannot challenge the Award issued by the Arbitrator. Respondent did not make an application to vacate or modify the Award within 90 days of its delivery as required under CPLR § 7511. The Court is therefore precluded from vacating or modifying the Award.

20.     In addition, the scope of judicial review of an arbitration proceeding is "extremely limited" and an award will be upheld "so long as the arbitrator offers [a] barely colorable justification for the outcome reached, and will be vacated only where it is totally irrational or exceeds a specifically enumerated limitation on the arbitrator's power" as provided under CPLR § 7511(b)(1). *Elul Diamonds Co. Ltd. v. Z Kor Diamonds, Inc.*, 50 A.D.3d 293, 854 N.Y.S.2d 391 (1st Dep't 2008) (affirming confirmation of arbitration award). *See also Wien & Malkin, LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 479, 813 N.Y.S.2d 691, 694 (2006); *McLaughlin, Piven, Vogel Sec., Inc. v. Ferrucci*, 67 A.D.3d 405, 406, 889 N.Y.S.2d 134, 135 (1st Dep't 2009).

21.     Critical to the confirmation process is the black-letter principle that a court is "not authorized to revisit" the arbitrator's "assessment of the evidence, interpretation of the contract or reasoning in fashioning the award." *N.Y. State Correctional Officers and Police Benevolent Ass'n, Inc. v. State of New York*, 94 N.Y.2d 321, 327, 726 N.E.2d 462 (1999); *see also Susan D. Settenbrino, P.C. v. Barroga-Hayes*, 89 A.D.3d 1094, 1095, 933 N.Y.S.2d 409, 410 (2nd Dep't 2011). Consequently, "even in circumstances where an arbitrator makes errors of law or fact, courts will not assume the role of overseers to conform the award to their sense of justice." *N.Y. State Correctional Officers*, 94 N.Y.2d. at 326. *See also New York City Transit Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*, 6 N.Y.3d 332, 336, 845 N.E.2d 1243, 1245 (2005) ("[C]ourts are obligated to give deference to the decision of the arbitrator. . . This is true even if the arbitrator misapplied the substantive law in the area of the contract.").

("[C]ourts are obligated to give deference to the decision of the arbitrator. . . This is true even if the arbitrator misapplied the substantive law in the area of the contract.").

22.    The Arbitrator's 19-page Award, which details the analysis and basis for the Award, more than satisfies the required standard.

WHEREFORE, M&O respectfully requests that this Court: (a) issue an Order pursuant to CPLR § 7510 confirming the Award issued by the Arbitrator (Exhibit A), (b) direct the clerk to enter Judgment pursuant to CPLR § 7514 on the Award against VMI (defined in the Agreement to include any successors in interest or successor entity incorporated, owned or controlled by Samuel Pinkus) and Mr. Pinkus as VMI's agent,  in the amount of $779,780.34 with post-judgment interest (at the statutory rate of 9%) calculated at a per diem rate of $192.27 until paid, and (c) award such other and further relief as the Court deems just and proper.

Dated:  September 19, 2012
      New York, New York

                              FRANKFURT KURNIT KLEIN & SELZ, P.C.

                              By:    Toby Butterfield, Esq.
                                   Wendy Stryker, Esq.
                                 488 Madison Avenue
                                 New York, New York 10022
                                 (212) 980-0120

TO:    Samuel Pinkus, Esq.
       Veritas Media, Inc.
       111 Euclid Avenue
       Hastings-On-Hudson, NY 10706

## VERIFICATION

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF NEW YORK  )

        EUGENE WINICK being duly sworn, deposes and states that he is an authorized

representative and agent of the petitioner named in the foregoing petition; that he has read the

foregoing petition and knows the contents thereof; that the same is true to his knowledge, except

as to those matters therein alleged upon information and belief; and that as to those matters, he

believes them to be true.

 

_____
Eugene Winick

Sworn to before me this
____th day of September, 2012

_____
Notary Public

ROGER ROBLES
Notary Public - State of New York
NO. 01RO6246742
Qualified in Westchester County
My Commission Expires _____

Case 1:13-cv-03059-RWS Document 1-2 Filed 05/03/13 Page 40 of 59

INDEX NO. 653312/2012

RECEIVED NYSCEF: 09/21/2012

# EXHIBIT A

JAMS
-----------------------------------------------------------X
In the Matter of the Arbitration Between

MCINTOSH AND OTIS, INC.,

and                                                    FINAL AWARD

VERITAS MEDIA, INC.

-----------------------------------------------------------X

  The parties to this arbitration are McIntosh & Otis, Inc. ("M&O"), represented by

Toby M.J. Butterfield, Esq., Frankfurt Kurnit Klein & Selz PC, 488 Madison Avenue,

New York, NY 10022, and Veritas Media, Inc. ("VMI"), represented, *pro se,* by its

President, Samuel Pinkus.[1]

  This claim arises from a Release and Settlement Agreement ("Agreement") made

as of January 13, 2006 (the "Effective Date") between M&O and VMI, which was

entered into in December 2008.  The Agreement is signed by Eugene Winick as President

of M&O and by Samuel Pinkus as President of VMI.  The Agreement is annexed as

Exhibit 2 to the Statement of Claim, which was filed on or about April 1, 2010.  This

dispute primarily concerns entitlement to commissions for acting as literary agent for

certain authors.

---

[1] Mr. Pinkus is an attorney admitted to practice in New York State and General Counsel
of VMI.

The agreement to arbitrate is contained in Paragraph 20 of the Agreement, which provides:

> 20.  <u>DISPUTE RESOLUTION</u>:
>
> Any disputes between or among M&O, VMI and Mr. Pinkus arising out of or relating to this Settlement Agreement in any manner, including disputes as to the formation, scope, existence, applicability or validity of this Settlement Agreement or of this Dispute Resolution Clause which cannot be resolved by the Parties or their counsel, will be submitted first to mediator [Peter] Woodin or a mutually agreed upon third party for resolution, and if mediation is unsuccessful, then to binding arbitration in new York City by a JAMS/Endispute neutral, under an expedited procedure that will be determined by the neutral after consultation with parties and their counsel. The decision of the arbitrator shall be final, and judgment upon the award rendered may be entered in any State or Federal court having jurisdiction over such decision.

In the Statement of Claim M&O alleges that VMI has failed to comply with certain terms of the Agreement and seeks various remedies, including the payment by VMI to M&O of commissions and other amounts alleged to be due under the Agreement, and the production of certain documents necessary to establish whether and in what amount M&O is entitled to further payments by VMI.

An arbitration hearing was held on May 4, 2011. During the course of the hearing, Mr. Pinkus testified that all of the assets of VMI were sold in or about 2008 or 2009, and that VMI currently has no assets. Accordingly, at the hearing and in its post-hearing submission, M&O has requested an award against Mr. Pinkus individually. Based upon representations in the opposition to this request, I re-opened the hearing to hear evidence regarding whether there was an express agreement that Mr. Pinkus would not be personally bound by the Agreement. The re-opened hearing was held on February 8, 2012, following which I received supplemental evidence and argument from the parties on February 23 and 29, and March 1, 2012. An Interim Award was issued on March 21,

2

2012, following which I received supplemental submissions from the parties on April 2 and 9, and May 4 and 10, 2012.

## CLAIMS AGAINST VMI

The Agreement, which is annexed to the Statement of Claim as Exhibit 2, memorializes the parties' acceptance of a comprehensive settlement proposal made by JAMS Mediator Peter Woodin that is reflected in two documents: (1) a Mediator's Proposal dated January 12, 2006 and (2) an e-mail modification dated January 13, 2006, which documents are annexed to the Statement of Claim as Exhibit 1.

Paragraph 2(B) of the Agreement identifies an outstanding dispute regarding the treatment of *Ghost Ship*, by Mary Higgins Clark, which was to be promptly resolved by negotiation between the parties or, failing a negotiated agreement, presented to Mr. Woodin for binding resolution. M&O submitted this issue to Mr. Woodin by letter dated March 5, 2009 (Statement of Claim, Exhibit 3). However, VMI declined to execute the necessary JAMS agreement to enable Mr. Woodin to serve as an arbitrator. This dispute is therefore presented for resolution in this proceeding. In addition, at the time of the Agreement, VMI held in escrow $84,000 claimed to be owed to M&O, which dispute was to be submitted to Mr. Woodin for decision no later than April 30, 2009. The Agreement provides that if a decision were not made by April 30, 2009, VMI would pay the $84,000 to M&O by May 1, 2009. As noted above, VMI declined to execute the necessary JAMS agreement to enable Mr. Woodin to serve as an arbitrator. Accordingly, no decision was rendered by April 30, 2009. M&O therefore claims in this proceeding that VMI must pay $84,000 to M&O pursuant to the terms of the Agreement. Finally, as

3

noted above, M&O asserts that VMI has materially breached the Agreement in several respects by failing to maintain and provide certain records, failing to provide required accountings, and failing to pay commissions and other payments due to M&O. M&O also seeks to recover from VMI the arbitration fees and expenses paid on behalf of VMI by M&O. Finally, M&O seeks prejudgment interest on amounts found to be owing to M&O, to be determined in a subsequent proceeding. M&O reserved its right to pursue a separate arbitration with respect to subsequent years, or for years for which it had been unable obtain documentation by the time of the arbitration hearing.

### Maintenance and Production of Records

M&O asserts and VMI acknowledges that it has failed to comply with the provisions of the Agreement that require the maintenance and production of contracts and royalty/commission statements. Indeed, Mr. Pinkus testified that he has discarded and therefore cannot produce *any* documentation relating to VMI's receipt of commissions or compliance with the Agreement. Accordingly, M&O has been forced to rely upon documentation that it has been able to obtain from third parties either voluntarily or by subpoena, and a "spreadsheet" provided by VMI in February 2009 that purports to provide an accounting of commissions received by VMI, and pursuant to which VMI made certain payments to M&O.

4

<u>Payments Due to M&O</u>

Paragraph 2(A) of the Agreement ("M&O'S CONTINUING RIGHT TO

COMMISSIONS") provides:

> VMI acknowledges and confirms that M&O shall have the right to receive
> from VMI commissions from the exploitation of rights in any of the Works of the
> Authors in accordance with the terms of the Mediator's Proposal, which is
> incorporated herein and made a part hereof, and as specified in the Joint Direction
> of Payment letters (the "JDPs") annexed hereto as Schedule D, which JDPs are
> incorporated herein and made a part hereof, for as long as VMI continues to
> receive commissions on such Works from or on behalf of each Author.

### *Ghost Ship*

> Paragraph 2 of the Mediator's Proposal provides in pertinent part:

> <u>Next book contract or amendment</u>:  Commissions will be split 25% to
> M&O and 75% to Veritas for contracts and/or amendments that cover (a) the next
> 2 books authored or co-authored by Mary Higgins Clark if both books are full
> length mystery/suspense novels, or (b) the next 3 books authored or co-authored
> by Mary Higgins Clark if one or both of the next 2 books is not a full length
> mystery/suspense novel. If one or more of the books covered by this commission
> allocation is part of a multi-book contract or amendment which includes books
> not covered by this allocation, commissions payable under the amendment or
> contract will be allocated to the individual books covered by the contract or
> amendment in accordance with past publishing history.

> The January 13, 2006 e-mail modification provides:

> For the Mary Higgins Clark next book contact or amendment, add at the
> end of the first sentence of that paragraph: "however, (c) if none of the next three
> books are full length mystery/suspense novels, then the 25%/75% split shall apply
> to the first two of the next three books, and then to the next full length
> mystery/suspense novel.

> Also, change the language in the last part of that paragraph by striking the
> phrase "past publishing history" and substituting "the recent history of advances
> for the types of books at issue.  Any dispute concerning the allocation of

commission among books of a multi-book contract will be resolved by the
binding decision of Peter Woodin or some other neutral agreed upon by the
parties."

Paragraph 3 of the JDP Letter provides:

**Future MHC Works.** With respect to future MHC works pursuant to any
amendment to the Agreement and/or a new publishing agreement, Commissions
shall be payable 25% to M&O and 75% to Veritas simultaneous with payment to
Veritas on behalf of MHC of MHC's advances and/or royalties for:

    a.  the next <u>two</u> works authored or co-authored by MHC, if both works
        are full-length mystery/suspense novels; or
    b.  the next <u>three</u> works authored or co-authored by MHC, if one or both
        of the next two works is not a full-length mystery/suspense novel by
        MHC alone; or, if none of the next three books is a full-length
        mystery/suspense novel, then
    c.  the first <u>two</u> of the next three books, and the next full length
        mystery/suspense novel; it being understood that, in such an event, the
        Commissions on all books between the first two non-full length
        mystery/suspense-novels and the next full-length mystery/suspense
        novel shall be paid to Veritas.

Mary Higgins Clark authored four books following the Mediator's Proposal that
are at issue in this arbitration: *Santa Cruise*, a Christmas book; *Ghost Ship*, an illustrated
children's book, *Where Are You Now*, a full-length mystery, and *Take My Heart*, a full-
length mystery. M&O contends that *Ghost Ship* should not be considered an MHC
Work, and that pursuant to the Mediator's Proposal and the JDP, it is therefore entitled to
25% of the commissions on *Santa Cruise*, *Where Are You Now* and *Take My Heart*. VMI
contends that *Ghost Ship* should be considered an MHC Work and that M&O is therefore
entitled to 25% of the commissions on *Santa Cruise*, *Ghost Ship* and *Where Are You
Now*.

As noted above, *Ghost Ship* is a children's book. The evidence presented at the
arbitration hearing established that prior to the mediation and the Mediator's Proposal,

6

Mary Higgins Clark had never written a children's book. The only type of MHC work
other than a full-length mystery/suspense novel for which M&O had received
commissions was a Christmas book. MHC Works were defined in Mary Higgins Clark's
then-existing publishing agreement as full-length novels of approximately 100,000
words. Mary Higgins Clark typically received multi-million dollar advances for full-
length novels. She in fact received advances of $1,600,000 for *Santa Cruise*,
$10,125,000 for *Where Are You Now* and $10,125,000 for *Take My Heart*. By contrast,
Mary Higgins Clark received an advance of $200,000 for *Ghost Ship*, a 2000-2500 word
children's story, pursuant to an amendment to her publishing agreement negotiated by
VMI in or about November 2006, but which was not revealed during the mediation and
not discovered by M&O until after the Mediator's Proposal and the signing of the JDP.
VMI's contention that *Ghost Ship* should be considered a Future MHC Work led to the
inclusion of Paragraph 2(B) of the Agreement, providing for prompt resolution of the
parties' dispute by Mr. Woodin in accordance with Paragraph 20. As noted above, M&O
submitted this issue to Mr. Woodin by letter dated March 5, 2009, but VMI declined to
execute the necessary JAMS agreement to enable Mr. Woodin to serve as an arbitrator,
leading to the presentation of the dispute in this arbitration.

     For substantially the reasons set forth in M&O's March 5, 2009 letter (Statement
of Claim, Exhibit 3), I find that *Ghost Ship* was not the type of MHC book at issue in the
January 2006 mediation or contemplated by the parties when they agreed to the
Mediator's Proposal, as amended, and is therefore not an MHC Work for purposes the
commission-sharing terms of the Agreement. It is apparent that M&O sought to ensure
that it would receive a share of the commissions on two full-length mystery/suspense

7

novels. Notably, because there was a possibility that Mary Higgins Clark would author another Christmas book, which had not historically resulted in significant royalties, M&O negotiated for the provision that if one of the next two MHC Works was not a full-length mystery/suspense novel, M&O would receive its share of commissions on the next *three* works. Clearly, M&O did not and would not have agreed to accept a share of commissions on a children's work, as opposed to a national bestseller mystery novel. I therefore find that M&O is entitled to a share of commissions as provided in the Agreement for *Santa Cruise, Where Are You Now* and *Take My Heart*. As set forth in M&O's Hearing Exhibit 2, M&O has received payments from VMI for *Santa Cruise, Ghost Ship* and *Where Are You Now*. M&O is entitled to payment in the amount of $202,500 for *Take My Heart*, against which VMI is entitled to a credit of $5,000 for *Ghost Ship*, resulting in an award to M&O of $197,500 for commissions due with respect to Future MHC Works.

### $84,000 Held in Escrow

The Agreement recites that VMI has placed $84,000 into an escrow account controlled by Mr. Pinkus's wife, Leigh Ann Winick, which amount "M&O claims VMI owes to M&O, but which VMI disputes." As noted above, pursuant to Paragraph 3(E) of the Agreement, this dispute was to be submitted to Mr. Woodin and resolved by him no later than April 29, 2009. M&O presented this issue to Mr. Woodin, but because VMI declined to execute the necessary JAMS agreement to enable Mr. Woodin to serve as an arbitrator, no decision was rendered. The Agreement provides that "VMI agrees that if a

8

decision has not been made by April 30, 2009, it will pay the $84,000 to M&O by May 1, 2009." VMI continues to dispute its obligation to pay the escrowed funds to M&O.

According to M&O, the funds in question represent commissions on advances paid with respect to the 75th Anniversary edition of *Joy of Cooking*. Under the Settlement Agreement, the Mediator's Proposal and the JDP executed by M&O and VMI, M&O is entitled to 75% of the *Joy of Cooking* commissions, including commissions on advances, for the years 2006-2008. M&O has submitted evidence showing that advances for the 75th Anniversary edition of *Joy of Cooking* in the amount of $750,000 were paid in 2006-2008, which were subject to a commission of 15%, or $112,500. Pursuant to the terms of the Agreement, M&O claims that 75% of this amount, or $84,375, should have been paid by VMI to M&O, but has never been received.

VMI does not dispute that the advances were paid, or that commissions were due to VMI and payable in part to M&O pursuant to the Agreement. Rather, VMI claims that it never "received" commissions on the advances, because VMI agreed to indemnify *Joy of Cooking* for legal fees incurred in a lawsuit brought by M&O in connection with the *Joy of Cooking* JDP. VMI contends that it has no obligation to share with M&O commissions that it never received.

I disagree. VMI had no right to essentially waive or remit fees that it was obligated to pay to M&O under the Agreement, or to decide unilaterally to use fees owed to M&O as requested by representatives of *Joy of Cooking*. VMI is therefore liable to M&O for $84,375, which it failed to remit to M&O. The amount held in escrow should have been used to satisfy this contractual obligation. At the arbitration hearing, Mr. Pinkus testified that the monies held in escrow were turned over to the purchaser of the

9

assets of VMI in 2008. The removal and use of the escrowed funds by VMI prior to participation in the agreed-upon dispute resolution process was utterly contrary to the concept of an escrow, and constituted a blatant breach of the Agreement. M&O is therefore permitted to collect this award by offset to any amounts that M&O may now or in the future owe to VMI pursuant to the Agreement.

### Other *Joy of Cooking* Claims

M&O claims that it is owed additional unpaid commissions on royalties earned on *Joy of Cooking*. The publisher's royalty reports, which reflect commissions paid to VMI through March 31, 2007, in the total amount of $188,905.52, are contained in M&O's Hearing Exhibit 4. VMI does not challenge the accuracy of the publisher's royalty reports, but asserts that it "did not receive" any commissions as a result of its agreement to indemnify the publisher in connection with the lawsuit brought by M&O with respect to the JDP. For the reasons set forth above in connection with the $84,000 escrow, I find that VMI was not entitled unilaterally to waive or remit commissions due to M&O. I therefore find that M&O is entitled to receive $36,493.71, which represents 75% of the commissions received by VMI ($47,084.18), less amounts previously paid by VMI ($10,590.47). To the extent VMI does not have assets to pay this award, M&O is permitted to collect this amount as an offset to amounts that M&O may now or in the future owe to VMI pursuant to the Agreement.


### Nelle Harper Lee

Nelle Harper Lee is the author of *To Kill a Mockingbird*. In the Agreement (signed in December 2008), VMI represents that since at least January 12, 2006, it has

10

been acting as agent of record for Nelle Harper Lee with respect to her publishing agreements in the United States and with respect to various foreign publishing subsidiary and ancillary agreements. VMI is required to notify M&O within thirty (30) days if VMI no longer acts as agent for Nelle Harper Lee.

As noted above, VMI has failed to comply with its obligation to maintain and produce documentation regarding commissions received that are subject to the Agreement. The only "documentation" provided by VMI in the record is a so-called "spreadsheet," provided in February 2009 (contained in M&O's Hearing Exhibit 3), which reflects a purported accounting for commissions received for the periods between June 30, 2005 and June 30, 2008, and calculation of a payment due to M&O of $160,823.50. M&O acknowledges payment of this amount, but disputes the calculation (M&O contends that it is owed an additional $5,031.68 as a result of the miscalculation).

M&O was able to obtain payment records directly from Nelle Harper Lee's United States publisher (Harper Collins), and submitted some documentation that appears to have been obtained from United Kingdom and Italy publishers, regarding commission payments for the years 2006 through 2010.   It is impossible to correlate these records with VMI's February 2009 accounting. Accordingly, M&O has presented a calculation of commissions paid to VMI based upon the publishers' records, to which it has added "estimates" of certain commissions that it contends are due on advances and royalties for 2009 and 2010 (M&O Hearing Exhibit 3).

While I understand M&O's frustration with VMI's failure to provide the documentation required by the Agreement, I cannot base an award on estimates. M&O could have insisted on receiving documentation directly from the publishers, but chose to

11

rely primarily on VMI's commitment and obligation to provide an accounting and supporting documentation. In hindsight, this was a potentially costly mistake. This does not, however, relieve M&O of its obligation to present proper, probative evidence of its claims. Accordingly, to the extent M&O's claim with respect to Nelle Harper Lee is based on estimates, it is denied.

Based upon the documentation obtained from Harper Collins, VMI received payments on behalf of Nelle Harper Lee for royalties earned through the period ending December 2009, totaling $1,688,064.68.[2]  In July 2010, VMI directed Harper Collins to send further royalty payments to a Citibank account in the name of Nelle Harper Lee. The address on the account is identical to the address for VMI. Pursuant to those instructions, Harper Collins sent $816,448.06 to the designated account on October 1, 2010, for royalties for the period ended June 30, 2010.

Mr. Pinkus testified that in November or December 2008, Nelle Harper terminated VMI as her literary agent effective January 1, 2009. He testified that all royalty payments received by VMI in 2009 and 2010 were sent by VMI to Nelle Harper Lee, and that no commission was collected by VMI on behalf of itself or M&O. Mr. Pinkus testified that the October 1, 2010 payment of $816,448.06 went directly to Nelle Harper Lee's Citibank account, for which VMI received no commission. Mr. Pinkus contends that because VMI received no commissions subsequent to VMI's February 2009 payment to M&O, no further commissions with respect to Nelle Harper Lee are due to M&O.

---

[2] This is the sum of $523,512.65, $100,000, $132,906.95, $540,732.59, and $390,912.59 (Harper Collins documents in M&O Hearing Exhibit 3).

12

Mr. Pinkus acknowledges that he did not notify Harper Collins of the termination of VMI's agency; nor did he notify M&O as required by the Agreement. Mr. Pinkus attributed this failure to administrative disorganization and "sloth." M&O presented evidence that as of 2010, Harper Collins's records reflected that VMI continued to represent Nelle Harper Lee. M&O also offered other documentary evidence that VMI continued to act on behalf of Nelle Harper Lee well into 2010. Apart from Mr. Pinkus's testimony, VMI offered no documentary or testimonial evidence regarding the termination, and offered no documentary or testimonial evidence that VMI sent the Harper Collins royalty payments to Nelle Harper Lee without deducting any commission. At a minimum, VMI's bank records would reflect such payments by VMI to Nelle Harper Lee. Overall, I draw a negative, adverse inference from VMI's failure to present evidence to support Mr. Pinkus's testimony, the contrary evidence presented by M&O, VMI's failure to advise Harper Collins of the termination of VMI's agency, and Mr. Pinkus's his cavalier attitude toward VMI's obligations under the Agreement, including the obligation to notify M&O of the termination of VMI's agency (which Mr. Pinkus described as a "technical" breach) and the obligation to maintain and produce documentation (Mr. Pinkus offered no credible explanation for simply "throwing out" all records related to VMI's receipt and disposition of royalty payments). I conclude that VMI breached the Agreement by failing to pay commissions due to M&O on the royalty payments made by Harper Collins through October 1, 2010, as reflected in the documentation provided by Harper Collins, and as set forth below.

Based upon the documentary evidence provided with respect to the United Kingdom, it appears that M&O has been paid commissions due from VMI for 2006-

13

2008, with the exception of $4,064.63 attributable to a miscalculation. With respect to 2009 and 2010, M&O's claim is based on an estimate and is denied for the reasons previously set forth.

Based upon the evidence presented with respect to Italy, it appears that M&O has not been paid for commissions due for 2007-2008, which total $2,674.07. With respect to 2009 and 2010, M&O's claim is based on an estimate and is denied for the reasons previously set forth.

Based upon the calculations provided by M&O in Hearing Exhibit 3, and eliminating the claimed commissions based on estimates (totaling $29,020.58), I find that M&O is owed commissions of $367,953.79, plus $5,031.58 based upon a miscalculation by VMI in the February 2009 payment, totaling $372,985.37. VMI has paid $160,823.50, leaving a balance due of $212,161.87. To the extent VMI does not have assets to pay this award, M&O is permitted to collect this amount as an offset to amounts that M&O may now or in the future owe to VMI pursuant to the Agreement.

<u>Noah Gordon</u>

The works of Noah Gordon are published almost exclusively in foreign countries. Although VMI has concededly received commissions on Noah Gordon's works, and has paid a portion of those commissions to M&O for 2007 and 2008 pursuant to the Agreement, VMI has not paid commissions for subsequent years and acknowledges that it has never provided M&O with royalty statements or contracts as required by the

14

Agreement. Moreover, Noah Gordon has refused to provide this information directly to M&O.[3]

M&O seeks an award of $25,313.49 in unpaid commissions for 2009-2010 with respect to Noah Gordon. M&O Hearing Exhibit 5. M&O's calculation is concededly an estimate, based royalties reported by VMI for 2007-2008, and foreign publishers' websites confirming current publications.

As noted above, I am unwilling to base an award on estimates. M&O's claim with respect to Noah Gordon is therefore denied.

Health Insurance Reimbursement

VMI has stipulated that M&O is owed $19,899.24 for health insurance provided pursuant to the terms of the Agreement through 2011.

Arbitration Fees and Expenses

M&O has paid JAMS a total of $32,436.54 in arbitration fees and expenses. Because VMI failed to pay its share of these fees and expenses, M&O was required to pay VMI's share in order to proceed with the arbitration. M&O seeks an award for the fees and expenses paid by M&O on behalf of VMI. M&O is hereby awarded one-half of the fees and expenses incurred on behalf of VMI, totaling $16,218.27.

---

[3] Paragraphs 3 and 4 of the Agreement provide a procedure to be followed when an author objects to the provision of royalty statements and contracts directly to M&O. Under these circumstances, VMI is required to submit the documentation to Mr. Woodin for *in camera* inspection to verify the accuracy of VMI's accounting. VMI failed to follow this procedure, and, as noted above, represents that all such records have been discarded. Because the publishers are located in foreign countries, M&O has not been able to obtain information directly from the publishers.

15

Prejudgment Interest

M&O is entitled to prejudgment interest pursuant to New York CPLR §5004, at the rate of 9% per year on unpaid commissions or other payments from the date due through the date of this Final Award. I have reviewed and adopt the calculations of prejudgment interest due through April 30, 2012, that were submitted by M&O following the issuance of the Interim Award, totaling $211,102.81, to which must be added interest from May 1 through June 8, 2012, in the amount of $2,029.44, resulting in a total award of prejudgment interest in the amount of $213,132.25.

Maintenance of Records and Accounting

As noted above, VMI has failed to maintain and provide record and accountings as required by the Agreement, asserting at the arbitration hearing that all records pertaining to its compliance with the Agreement had been discarded. The Agreement, however, remains in full force and effect, and VMI is obligated to comply with all provisions of the Agreement until the end of its term. VMI is therefore directed to comply with all terms of the Agreement on a going forward basis, to the extent VMI, or Mr. Pinkus as its agent, receives or has received any documentation or commissions subject to the Agreement.

## LIABILITY OF MR. PINKUS

M&O seeks to hold Mr. Pinkus personally liable for VMI's corporate obligations by "piercing the corporate veil." "The general rule, of course, is that a corporation exists independently of its owners, who are not personally liable for its obligations, and that

16

individuals may incorporate for the express purpose of limiting their liability." *East Hampton Union Free School District, Respondent, v Sandpebble Builders, Inc., et al.*, 66 A.D.3d 122, 126 (2d Dep't 2009), *aff'd*, 16 N.Y.3d 775 (2011) (citations omitted).

> The concept of piercing the corporate veil is an exception to this general rule, permitting, in certain circumstances, the imposition of personal liability on owners for the obligations of their corporation. A plaintiff seeking to pierce the corporate veil must demonstrate that a court in equity should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff.

*Id.* (citations omitted). Domination, standing alone, is not sufficient, because imposing personal liability based solely on domination would "render[] the principle of limited liability largely illusory," and "every cause of action brought against a corporation either wholly or principally owned by an individual who conducts corporate affairs could also be asserted against that owner personally." *Id.* "Thus, the party seeking to pierce the corporate veil must also establish that the owners, through their domination, abused the privilege of doing business in the corporate form." *Id.* (citations and internal quotation omitted). The factors to be considered in determining whether the owner has abused the privilege of doing business in the corporate form include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use. *Id.* at 127 (citations omitted).

There is no question in this case that Mr. Pinkus exercised dominion and control over VMI. There is, however, virtually no evidence that he acted other than in his capacity as president and principal owner of VMI, or that he failed to respect the separate legal existence of the corporation. M&O points out that Mr. Pinkus conducts the business of VMI from his home, that Mr. Pinkus caused VMI funds held in escrow to be

17

used in connection with the sale of VMI assets, that Mr. Pinkus personally benefitted from certain provisions of the Agreement, and that Mr. Pinkus on occasion used a personal email address to conduct VMI business. None of this evidence sufficiently demonstrates that Mr. Pinkus treated VMI's corporate assets as his own, or that he undercapitalized the corporation, or that he did not respect corporate formalities, or that he, in any other way, abused the privilege of doing business in the corporate form, to implicate the doctrine of piercing the corporate veil. I therefore decline to find Mr. Pinkus personally liable for the award in this arbitration.[4]

## CONCLUSION

I find that VMI breached the Agreement and is liable to M&O in the following amounts:

```
$197,500.00  Take My Heart (Ghost Ship Issue)
$ 84,375.00  Joy of Cooking 75th Anniversary (Escrow Issue)
$ 36,493.71  Joy of Cooking
$212,161.87  Nelle Harper Lee
$ 19,899.24  Health Insurance
$ 16,218.27  Arbitration Fees and Expenses
$213,132.25  Prejudgment Interest
$779,780.34  TOTAL DUE TO M&O
```

To the extent VMI does not have assets to pay this award, M&O is permitted to collect this amount as an offset to amounts that M&O may now or in the future owe to VMI pursuant to the Agreement.

---

[4] I express no opinion with respect to whether a court action could be brought against Mr. Pinkus on the theory that he induced VMI to breach the Agreement.

VMI is further directed to comply with all terms of the Agreement on a going forward basis, to the extent VMI, or Mr. Pinkus as its agent, receives or has received any documentation or commissions subject to the Agreement.

SO ORDERED.

KATHLEEN A. ROBERTS
ARBITRATOR

June 8, 2012

19